| | |
|---|---|
| CRYSTAL LAMB, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | CLASS ACTION |
| v. | |
| ONETOUCHPOINT CORP., | JURY TRIAL DEMANDED |
| Defendant. | |

## CLASS ACTION COMPLAINT

Plaintiff Crystal Lamb ("Plaintiff"), individually and on behalf of all others similarly situated (collectively, "Class members"), by and through her attorneys, brings this Class Action Complaint against Defendant OneTouchPoint Corp. ("OTP") and complains and alleges upon personal knowledge as to herself and information and belief as to all other matters.

## INTRODUCTION

1.      Plaintiff brings this class action against OTP for its failure to secure and safeguard her and at least 2,651,396 other individuals' personally identifiable information ("PII") and personal health information ("PHI"), including names, member IDs, and information that may have been provided during a health assessment.

2.      OTP provides printing and mailing services to health insurance carriers and medical providers.

3.      On or about April 27, 2022, unauthorized individuals gained access to OTP's network systems and had access to and encrypted files that contained the PII/PHI of Plaintiff and Class members (the "Data Breach").

4.      OTP owed a duty to Plaintiff and Class members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their PII/PHI against unauthorized access and disclosure. OTP breached that duty by, among other things, failing to implement and maintain reasonable security procedures and practices to protect its customers' patients' PII/PHI from unauthorized access and disclosure.

5.      As a result of OTP's inadequate security and breach of its duties and obligations, the Data Breach occurred, and Plaintiff's and Class members' PII/PHI was accessed and disclosed. This action seeks to remedy these failings and their consequences. Plaintiff brings this action on behalf of herself and all United States residents whose PII/PHI was exposed as a result of the Data Breach, which OTP learned of on or about April 28, 2022, and first publicly acknowledged on or about July 27, 2022, approximately three months after the breach was discovered.

6.      Plaintiff, on behalf of herself and all other Class members, asserts claims for negligence, negligence per se, breach of express contract, breach of implied contract, and unjust enrichment, and seeks declaratory relief, injunctive relief, monetary damages, statutory damages, punitive damages, equitable relief, and all other relief authorized by law.

## PARTIES

7.      Plaintiff Crystal Lamb is an Ohio resident. She received health insurance from CareSource, a company that hired OTP to provide printing services. She received a letter from OTP notifying her that her PII/PHI may have been exposed in the Data Breach. Plaintiff Lamb would not have obtained health insurance from CareSource had she known that her information would be transmitted to OTP and not adequately safeguarded by OTP.

8.      Defendant OneTouchPoint Corp. is a Delaware corporation. OTP's corporate headquarters are located at 1225 Walnut Ridge Drive, Hartland, Wisconsin 53029.

## JURISDICTION AND VENUE

9.     The Court has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332(d)(2), because (a) there are 100 or more Class members, (b) at least one Class member is a citizen of a state that is diverse from Defendant's citizenship, and (c) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

10.     This Court has personal jurisdiction over OTP because OTP has its principal place of business in Wisconsin.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because OTP's principal place of business is located in Waukesha County, Wisconsin.

## FACTUAL ALLEGATIONS

### *Overview of OTP*

12.     OTP claims to provide "end-to-end services" to its customers, including marketing, management, production, distribution, and analysis.[1] The company claims to have "more than 3,000 customers."[2]

13.     In the regular course of its business, OTP collects and maintains the PII/PHI of customers of the health insurance companies for whom OTP provides printing and other services.

14.     OTP's website contains a Privacy Policy which states that the company "respects the privacy" of its customers.[3] The policy also lists the instances in which OTP can share the PII/PHI it collects, none of which include sharing that information with unauthorized users of its network.[4]

---

[1] *Services*, ONETOUCHPOINT, https://1touchpoint.com/services (last accessed Sep. 20, 2022).
[2] *Id.*
[3] *Privacy Policy*, ONETOUCHPOINT, https://1touchpoint.com/privacy-policy (last accessed Sep. 20, 2022).
[4] *See Id.*

3

15.     Plaintiff and Class members are, or were, persons whose health insurance carriers or health care providers used OTP for billing services and entrusted OTP with their PII/PHI.

### *The Data Breach*

16.     On or about April 27, 2022, an unauthorized individual, or unauthorized individuals, gained access to OTP's network systems and accessed and encrypted certain files from OTP's computer systems. OTP discovered the Data Breach on or about April 28, 2022.

17.     OTP did not begin to notify government agencies or the public about the data breach until nearly three months after it discovered the breach, on or about July 27, 2022. The notice OTP posted on its website states the information that was disclosed included:

> "[A]n individual's name, member ID, and information that may have provided during a health assessment."[5]

18.     In the notice, OTP "encourages individuals to remain vigilant against incidents of identity theft and fraud, to review account statements and explanation of benefits forms, and monitoring free credit reports for suspicious activity, and detect errors."[6]

### *OTP Knew that Criminals Target PII/PHI*

19.     At all relevant times, OTP knew, or should have known, that the PII/PHI that it collected was a target for malicious actors. Despite such knowledge, OTP failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiff's and Class members' PII/PHI from cyber-attacks that OTP should have anticipated and guarded against.

20.     It is well known amongst companies that store sensitive personally identifying information that sensitive information—such as the medical information stolen in the Data

---

[5] *Notice of Data Security Event*, ONETOUCHPOINT, https://1touchpoint.com/notice-of-data-event (last accessed Sep. 20, 2022).
[6] *Id.*

Breach—is valuable and frequently targeted by criminals. In a recent article, *Business Insider* noted that "[d]ata breaches are on the rise for all kinds of businesses, including retailers . . . . Many of them were caused by flaws in . . . systems either online or in stores."[7]

21.   Cyber criminals seek out PHI at a greater rate than other sources of personal information. In a 2022 report, the healthcare compliance company Protenus found that there were 905 medical data breaches in 2021 with over 50 million patient records exposed.[8] This is an increase from the 758 medical data breaches which exposed approximately 40 million records that Protenus compiled in 2020.[9]

22.   PII/PHI is a valuable property right.[10] The value of PII/PHI as a commodity is measurable.[11] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[12] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[13] It is so valuable to identity thieves that once PII/PHI has

---

[7] Dennis Green, Mary Hanbury & Aine Cain, *If you bought anything from these 19 companies recently, your data may have been stolen*, BUSINESS INSIDER (Nov. 19, 2019, 8:05 A.M.), https://www.businessinsider.com/data-breaches-retailers-consumer-companies-2019-1.

[8] PROTENUS, *2022 Breach Barometer*, PROTENUS.COM, https://www.protenus.com/breach-barometer-report (last accessed Sep. 20, 2022).

[9] *Id*.

[10] *See* Marc van Lieshout, *The Value of Personal Data*, 457 International Federation for Information Processing 26 (May 2015) ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible…"), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data.

[11] *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE.COM (April 28, 2014), http://www.medscape.com/viewarticle/824192.

[12] OECD, *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD ILIBRARY (April 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

[13] IAB Data Center of Excellence, *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, IAB.COM (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

23.    As a result of their real and significant value, identity thieves and other cyber criminals have openly posted credit card numbers, SSNs, PII/PHI, and other sensitive information directly on various Internet websites making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be readily aggregated and become more valuable to thieves and more damaging to victims.

24.    PHI is particularly valuable and has been referred to as a "treasure trove for criminals."[14] A cybercriminal who steals a person's PHI can end up with as many as "seven to ten personal identifying characteristics of an individual."[15] A study by Experian found that the "average total cost" of medical identity theft is "about $20,000" per incident, and that a majority of victims of medical identity theft were forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[16]

25.    All-inclusive health insurance dossiers containing sensitive health insurance information, names, addresses, telephone numbers, email addresses, SSNs, and bank account information, complete with account and routing numbers, can fetch up to $1,200 to $1,300 each on the black market.[17] According to a report released by the Federal Bureau of Investigation's

---

[14] *See* Andrew Steager, *What Happens to Stolen Healthcare Data*, HEALTHTECH MAGAZINE (Oct. 20, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon ("*What Happens to Stolen Healthcare Data* Article") (quoting Tom Kellermann, Chief Cybersecurity Officer, Carbon Black, stating "Health information is a treasure trove for criminals.").

[15] *Id.*

[16] *See* Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (Mar. 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims.

[17] SC Staff, *Health Insurance Credentials Fetch High Prices in the Online Black Market*, SC MAGAZINE (July 16, 2013), https://www.scmagazine.com/news/breach/health-insurance-credentials-fetch-high-prices-in-the-online-black-market.

("FBI") Cyber Division, criminals can sell healthcare records for 50 times the price of a stolen Social Security or credit card number.[18]

26.     Criminals can use stolen PII/PHI to extort a financial payment by "leveraging details specific to a disease or terminal illness."[19] Quoting Carbon Black's Chief Cybersecurity Officer, one recent article explained: "Traditional criminals understand the power of coercion and extortion . . . By having healthcare information—specifically, regarding a sexually transmitted disease or terminal illness—that information can be used to extort or coerce someone to do what you want them to do."[20]

27.     Consumers place a high value on the privacy of that data, as they should. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[21]

28.     Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII/PHI has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

---

[18] Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain* (April 8, 2014),
https://www.illuminweb.com/wp-content/uploads/ill-mo-uploads/103/2418/health-systems-cyber-intrusions.pdf.
[19] *See* Andrew Steager, *What Happens to Stolen Healthcare Data*, *supra* at n.14.
[20] *Id.*
[21] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior*, *An Experimental Study*, 22(2) INFORMATION SYSTEMS RESEARCH 254 (June 2011)
https://www.jstor.org/stable/23015560?seq=1.

### *Theft of PII/PHI Has Grave and Lasting Consequences for Victims*

29.     Theft of PII/PHI is serious. The FTC warns consumers that identity thieves use PII/PHI to receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[22]

30.     Identity thieves use personal information for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.[23] According to Experian, one of the largest credit reporting companies in the world, "[t]he research shows that personal information is valuable to identity thieves, and if they can get access to it, they will use it" to among other things: open a new credit card or loan; change a billing address so the victim no longer receives bills; open new utilities; obtain a mobile phone; open a bank account and write bad checks; use a debit card number to withdraw funds; obtain a new driver's license or ID; use the victim's information in the event of arrest or court action.[24]

31.     With access to an individual's PII, criminals can do more than just empty a victim's bank account—they can also commit all manner of fraud, including: opening utility accounts using

---

[22] *See* Federal Trade Commission, *What to Know About Identity Theft*, FEDERAL TRADE COMMISSION CONSUMER INFORMATION, https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed Sep. 20, 2022).

[23] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 16 C.F.R. § 603.2. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number. *Id.*

[24] *See* Susan Henson, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself*, EXPERIAN, https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/ (last accessed Sep. 20, 2022).

the victim's identity; file a fraudulent tax return using the victim's information; or even give the victim's personal information to police during an arrest.[25]

32.    Identity theft is not an easy problem to solve. In a survey, the Identity Theft Resource Center found that most victims of identity crimes need more than a month to resolve issues stemming from identity theft and some need over a year.[26]

33.    Theft of PII is even more serious when it includes theft of PHI. Data breaches involving medical information "typically leave[] a trail of falsified information in medical records that can plague victims' medical and financial lives for years."[27] It "is also more difficult to detect, taking almost twice as long as normal identity theft."[28] In warning consumers on the dangers of medical identity theft, the FTC states that an identity thief may use PII/PHI "to see a doctor, get prescription drugs, buy medical devices, submit claims with your insurance provider, or get other medical care."[29] The FTC also warns, "If the thief's health information is mixed with yours, it could affect the medical care you're able to get or the health insurance benefits you're able to use.

---

[25] *See* Federal Trade Commission, *Warning Signs of Identity Theft*, IDENTITYTHEFT.GOV https://www.identitytheft.gov/Warning-Signs-of-Identity-Theft (last accessed Sep. 20, 2022).
[26] Identity Theft Resource Center, *2021 Consumer Aftermath Report*, IDENTITY THEFT RESOURCE CENTER (2021), https://www.idtheftcenter.org/identity-theft-aftermath-study/ (last accessed Sep. 20, 2022).
[27] Pam Dixon and John Emerson, *The Geography of Medical Identity Theft*, FTC.GOV (Dec. 12, 2017), https://www.ftc.gov/system/files/documents/public_comments/2018/01/00037-142815.pdf
[28] *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk…*, *supra* at n.18.
[29] *See* Federal Trade Commission, *What to Know About Medical Identity Theft*, Federal Trade Commission Consumer Information, https://www.consumer.ftc.gov/articles/what-know-about-medical-identity-theft (last accessed Sep. 20, 2022).

It could also hurt your credit."[30]

34.     A report published by the World Privacy Forum and presented at the US FTC

Workshop on Informational Injury describes what medical identity theft victims may experience:

- Changes to their health care records, most often the addition of falsified information, through improper billing activity or activity by imposters. These changes can affect the healthcare a person receives if the errors are not caught and corrected.

- Significant bills for medical goods and services not sought nor received.

- Issues with insurance, co-pays, and insurance caps.

- Long-term credit problems based on problems with debt collectors reporting debt due to identity theft.

- Serious life consequences resulting from the crime; for example, victims have been falsely accused of being drug users based on falsified entries to their medical files; victims have had their children removed from them due to medical activities of the imposter; victims have been denied jobs due to incorrect information placed in their health files due to the crime.

- As a result of improper and/or fraudulent medical debt reporting, victims may not qualify for mortgage or other loans and may experience other financial impacts.

- Phantom medical debt collection based on medical billing or other identity information.

- Sales of medical debt arising from identity theft can perpetuate a victim's debt collection and credit problems, through no fault of their own.[31]

35.     There may also be a time lag between when sensitive personal information is stolen,

when it is used, and when a person discovers it has been used. For example, on average it takes

approximately three months for consumers to discover their identity has been stolen and used, but

it takes some individuals up to three years to learn that information.[32]

_____

[30] *Id.*
[31] *See* Pam Dixon and John Emerson, *The Geography of Medical Identity Theft*, *supra* at 27.
[32] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 Journal of Systemics, Cybernetics and Informatics 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

36.    It is within this context that Plaintiff and Class members must now live with the knowledge that their PII/PHI is forever in cyberspace and was taken by people willing to use the information for any number of improper purposes and scams, including making the information available for sale on the black-market.

### *Damages Sustained by Plaintiff and the Other Class Members*

37.    Plaintiff and Class members have suffered injury and damages, including, but not limited to: (i) a substantially increased risk of identity theft and medical identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII/PHI; (iii) breach of the confidentiality of their PII/PHI; (iv) deprivation of the value of their PII/PHI, for which there is a well-established national and international market; (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft and medical identity theft they face and will continue to face; and (vi) overpayment for the services that were received without adequate data security.

## CLASS ALLEGATIONS

38.    This action is brought and may be properly maintained as a class action pursuant to Federal Rule of Civil Procedure 23.

39.    Plaintiff brings this action on behalf of herself and all members of the following Class of similarly situated persons:

> All persons residing in the United States whose PHI/PII was disclosed to unauthorized persons in the Data Breach, including all who were sent a notice of the Data Breach.

40. Excluded from the Class is OneTouchPoint Corp. and its affiliates, parents, subsidiaries, officers, agents, and directors, as well as the judge(s) presiding over this matter and the clerks of said judge(s).

41. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

42. The members in the Class are so numerous that joinder of each of the Class members in a single proceeding would be impracticable. OTP reported to Maine Attorney General that approximately 2,651,396 persons' information was exposed in the Data Breach.[33]

43. Common questions of law and fact exist as to all Class members and predominate over any potential questions affecting only individual Class members. Such common questions of law or fact include, *inter alia*:

   a. Whether OTP had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiff's and Class Members' PII/PHI from unauthorized access and disclosure;

   b. Whether OTP failed to exercise reasonable care to secure and safeguard Plaintiff's and Class Members' PII/PHI;

   c. Whether an implied contract existed between Class members' health care providers and OTP, for which Class members are a third-party beneficiary, providing that OTP would implement and maintain reasonable security

---

[33] *Data Breach Notifications*, Office of the Maine Attorney General, https://apps.web.maine.gov/online/aeviewer/ME/40/0a2e4b99-8e95-4860-b05f-62c239a13993.shtml (last accessed Sep. 20, 2022).

measures to protect and secure Class Members' PII/PHI from unauthorized access and disclosure;

    d.   Whether OTP breached its duties to protect Plaintiff's and Class members' PII/PHI; and

    e.   Whether Plaintiff and Class members are entitled to damages, and the measure of such damages and relief.

44.    OTP engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of herself and all other Class members. Individual questions, if any, pale in comparison in both quantity and quality to the numerous common questions that dominate this action.

45.    Plaintiff's claims are typical of the claims of the Class. Plaintiff, like all proposed members of the Class, had her PII/PHI compromised in the Data Breach. Plaintiff and Class members were injured by the same wrongful acts, practices, and omissions committed by OTP, as described herein. Plaintiff's claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class members.

46.    Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff is an adequate representative of the Class in that she has no interests adverse to, or that conflict with, the Class she seeks to represent. Plaintiff has retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

47.    A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiff

and Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against OTP, so it would be impracticable for Class members to individually seek redress from OTP's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE

48.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

49.     OTP owed a duty to Plaintiff and Class members to exercise reasonable care in safeguarding and protecting their PII/PHI in its possession, custody, or control.

50.     OTP knew the risks of collecting and storing Plaintiff's and all other Class members' PII/PHI and the importance of maintaining secure systems. OTP knew of the many data breaches that targeted companies that stored PII/PHI in recent years.

51.     Given the nature of OTP's business, the sensitivity and value of the PII/PHI it maintains, and the resources at its disposal, OTP should have identified the vulnerabilities to their systems and prevented the Data Breach from occurring.

52.     OTP breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls,

policies, procedures, protocols, and software and hardware systems to safeguard and protect PII/PHI entrusted to it—including Plaintiff's and Class members' PII/PHI.

53.     It was reasonably foreseeable to OTP that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiff's and Class members' PII/PHI to unauthorized individuals.

54.     But for OTP's negligent conduct or breach of the above-described duties owed to Plaintiff and Class members, their PII/PHI would not have been compromised.

55.     As a result of OTP's above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiff and Class members have suffered, and will continue to suffer, economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased risk of identity theft and medical identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII/PHI; (iii) breach of the confidentiality of their PII/PHI; (iv) deprivation of the value of their PII/PHI, for which there is a well-established national and international market; (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft and medical identity theft they face and will continue to face; and (vi) overpayment for the services that were received without adequate data security.

## COUNT II
## NEGLIGENCE PER SE

56. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

57. OTP's duties arise from Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by businesses, such as OTP, of failing to employ reasonable measures to protect and secure PII/PHI.

58. OTP violated Section 5 of the FTCA by failing to use reasonable measures to protect Plaintiff's and Class members' PII and not complying with applicable industry standards. OTP's conduct was particularly unreasonable given the nature and amount of PII/PHI it obtains and stores, and the foreseeable consequences of a data breach involving PII/PHI including, specifically, the substantial damages that would result to Plaintiff and the other Class members.

59. OTP's violation of Section 5 of the FTCA constitutes negligence per se.

60. Plaintiff and Class members are within the class of persons that Section 5 of the FTCA was intended to protect.

61. The harm occurring as a result of the Data Breach is the type of harm Section 5 of the FTCA was intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair practices or deceptive practices, caused the same type of harm that has been suffered by Plaintiff and Class members as a result of the Data Brach.

62. It was reasonably foreseeable to OTP that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security

processes, controls, policies, procedures, protocols, and software and hardware systems, would result in the release, disclosure, and dissemination of Plaintiff's and Class members' PII/PHI to unauthorized individuals.

63.     The injury and harm that Plaintiff and Class members suffered was the direct and proximate result of OTP's violations of Section 5 of the FTCA. Plaintiff and Class members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased risk of identity theft and medical identity theft— risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII/PHI; (iii) breach of the confidentiality of their PII/PHI; (iv) deprivation of the value of their PII/PHI, for which there is a well-established national and international market; (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft and medical identity theft they face and will continue to face; and (vi) overpayment for the services that were received without adequate data security.

## COUNT III
## BREACH OF EXPRESS CONTRACT

64.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

65.     Plaintiff and Class members were the intended third-party beneficiaries of contracts entered into between OTP and Plaintiff's and Class members' health insurance carriers or health care providers. Plaintiff's and Class members' health insurance carriers or health care providers entered into contracts under which the health insurance carriers or health care providers paid monies to OTP and OTP provided printing or other services to the health insurance carriers or health care providers. Plaintiff and Class members were intended to

17

benefit from these contracts, as they were the parties that were being billed for their health insurance carriers or health care providers' services. As evidenced by OTP's Privacy Policy, the safekeeping of Plaintiff and Class members' PII/PHI was necessary under the contracts.

66. OTP breached its obligations under the contracts between itself and Plaintiff's and Class members' health insurance carriers or health care providers by failing to implement and maintain reasonable security measures to protect and secure the PII/PHI of Plaintiff and Class members.

67. OTP's breach of the express contracts between itself, on the one hand, and Plaintiff's and Class members' health insurance carriers or health care providers, on the other hand, for which Plaintiff and Class members were intended third-party beneficiaries, directly caused the Data Breach.

68. Plaintiff and Class members were damaged by OTP's breach of express contracts because: (i) they paid their health insurance carrier or health care provider for data security protection they did not receive; (ii) they face a substantially increased risk of identity theft and medical identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their PII/PHI was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their PII/PHI has been breached; (v) they were deprived of the value of their PII/PHI, for which there is a well-established national and international market; (vi) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face; and (vii) overpayment for the services that were received without adequate data security.

**COUNT IV**
**BREACH OF IMPLIED CONTRACT**

69.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

70.     In connection with receiving printing or other services, Plaintiff's and Class members' health insurance carriers or health care providers entered into implied contracts with OTP for which Plaintiff and Class members were intended third party beneficiaries.

71.     Pursuant to these implied contracts, Plaintiff's and Class members' health insurance carriers or health care providers paid money to OTP and provided OTP with Plaintiff and Class members' PII/PHI. In exchange, OTP agreed to, among other things, and Plaintiff's and Class members' health insurance carriers or health care providers understood that OTP would: (1) provide printing or other services to the health insurance carriers or health care providers; (2) take reasonable measures to protect the security and confidentiality of Plaintiff's and Class members' PII/PHI; and (3) protect Plaintiff's and Class members' PII/PHI in compliance with federal and state laws and regulations and industry standards.

72.     The protection of PII/PHI was a material term of the implied contracts between Plaintiff's and Class members' health care providers, on the one hand, and OTP, on the other hand. Indeed, as set forth *supra*, OTP recognized the importance of data security and the privacy of the PII/PHI it collects in its Privacy Policy.

73.     OTP breached its obligations under its implied contracts with Plaintiff's and Class members' health insurance carriers or health care providers in failing to implement and maintain reasonable security measures to protect and secure their PII/PHI and in failing to implement and maintain security protocols and procedures to protect Plaintiff's and Class

19

members' PII/PHI in a manner that complies with applicable laws, regulations, and industry standards.

74.     OTP's breach of its obligations of its implied contracts with Plaintiff's and Class members' health care providers directly resulted in the Data Breach and the injuries that Plaintiff and Class members have suffered from the Data Breach.

75.     Plaintiff and Class members were damaged by OTP's breach of implied contracts because: (i) they paid their health insurance carrier or medical provider for data security protection they did not receive; (ii) they face a substantially increased risk of identity theft and medical identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their PII/PHI was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their PII/PHI has been breached; (v) they were deprived of the value of their PII/PHI, for which there is a well-established national and international market; (vi) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face; and (vii) overpayment for the services that were received without adequate data security.

## COUNT V
## UNJUST ENRICHMENT

76.     Plaintiff realleges and incorporates by reference paragraphs 1–47 as if fully set forth herein.

77.     This claim is pleaded in the alternative to the breach of express and implied contract claims.

78.     Plaintiff and Class members conferred a monetary benefit upon OTP indirectly through their health insurance carriers or health care providers in the form of monies paid for

health insurance or health care services, which the health insurance carriers or health care providers used to obtain printing or other services from OTP.

79. OTP accepted or had knowledge of the benefits conferred upon it by Plaintiff and Class Members. OTP also benefitted from the receipt of Plaintiff's and Class members' PII/PHI, as this was used in providing the printing or other services.

80. As a result of OTP's conduct, Plaintiff and Class members suffered actual damages in an amount equal to the difference in value between their payments made with reasonable data privacy and security practices and procedures that Plaintiff and Class members paid for, and those payments without reasonable data privacy and security practices and procedures that they received.

81. OTP should not be permitted to retain the money belonging to Plaintiff and Class members because OTP failed to adequately implement the data privacy and security procedures for itself that Plaintiff and Class members paid for and that were otherwise mandated by federal, state, and local laws and industry standards.

82. OTP should be compelled to provide for the benefit of Plaintiff and Class members all unlawful proceeds received by it as a result of the conduct and Data Breach alleged herein.

## PRAYER FOR RELIEF

Plaintiff, individually and on behalf of all other members of the Class, respectfully requests that the Court enter judgment in her favor and against OTP as follows:

A. Certifying the Class as requested herein, designating Plaintiff as Class representative, and appointing Plaintiff's counsel as Class Counsel;

B. Awarding Plaintiff and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

C.      Awarding Plaintiff and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiff, on behalf of herself and the Class, seeks appropriate injunctive relief designed to prevent OTP from experiencing another data breach by adopting and implementing best data security practices to safeguard PII/PHI and to provide or extend credit monitoring services and similar services to protect against all types of identity theft and medical identity theft;

D.      Awarding Plaintiff and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

E.      Awarding Plaintiff and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F.      Awarding Plaintiff and the Class such other favorable relief as allowable under law.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury of all claims in this Class Action Complaint so triable.

Dated: September 20, 2022                    Respectfully submitted,

/s/ Ben Barnow____
BEN BARNOW
*b.barnow@barnowlaw.com*
ANTHONY L. PARKHILL*
*aparkhill@barnowlaw.com*
RILEY W. PRINCE*
*rprince@barnowlaw.com*
**BARNOW AND ASSOCIATES, P.C.**
205 West Randolph Street, Ste. 1630
Chicago, IL 60606
Tel: 312.621.2000
Fax: 312.641.5504

*admission to be sought